UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>      Plaintiff,<br><br>      v.<br><br>MARY FARNSWORTH, Forest Supervisor, Idaho Panhandle National Forest, LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, THOMAS TIDWELL, Chief, United States Forest Service, an agency of the U.S. Department of Agriculture,<br><br>      Defendant. | Case No. 2:16-cv-433-BLW<br><br>MEMORANDUM DECISION AND ORDER |

# INTRODUCTION

The Court has before it a motion for injunctive relief filed by plaintiff, the Alliance for the Wild Rockies. Alliance seeks to enjoin two logging projects in northern Idaho. For the reasons discussed below, the motion is denied.

# FACTUAL BACKGROUND

The Idaho Panhandle National Forests (IPNF) encompass almost 2.5 million acres in northern Idaho and a small portion of Washington. In 2015, wildfires burned 47,500 acres in the IPNF. Following the fires, the Forest Service sought to restore the forest and

allow logging in the burned area. Two of those restoration projects are at issue here: (1) the Tower Fire Salvage Project, comprised of 3,154 acres of burned area located six miles west of Priest Lake, Idaho, and (2) the Grizzly Fire Salvage and Restoration Project, comprised of 14,500 acres of burned area in Shoshone County, Idaho. *Id*.

The Tower Project aims to salvage merchantable dead or dying trees to (1) protect the health and safety of the public; (2) restore areas burned by the Tower Fire; and (3) recover the remaining economic value of the timber. The project will remove "danger trees" on 52 miles of road, 8 miles of hiking trails, and 17 miles of snowmobile trails in the burned area. According to the Forest Service, the project will also reduce future fire severity by reducing the fuel in the area. The Forest Service plans to restore the forest by replanting native trees to reestablish desired forested conditions.

The Grizzly Project will remove trees that could be a safety hazard along 27 miles of forest roads, restore burned areas with desired tree species, and allow logging in about 1,700 acres burned area. *Id*. at 4. There will also be additional maintenance and reconstruction of existing roads as part of the project.

The Forest Service began receiving public input on the projects in October 2015 when they posted information on the projects on the Forest Service website. *See Scaife Declaration (Dkt. No. 14-2)* at ¶ 16. In late January, 2016, the Forest Service sent two letters – identified as scoping letters – that described in detail the projects. The scoping letter describing the Grizzly Project was sent to about 330 interested parties, *id.* at ¶ 17,

and the scoping letter describing the Tower Project was sent to about 225 interested parties. *See Environmental Assessment for Tower Project (Dkt. No. 8-10)* at p. 9.

The scoping letters included a detailed description of the fires' impacts, the reasons why the Forest Service wanted to conduct salvage logging, and a notice that the Forest Service would be seeking to expedite the projects through an Emergency Situation Determination (ESD). They explained that if the ESD was granted, it would authorize immediate implementation of the projects once the agency had decided to proceed. The letters concluded by asking for public comment. Alliance received these letters and filed comments on the Projects. In addition to these letters, the Forest Service held two public meetings during the comment period and organized field trips to the project sites. *Id.*

The Panhandle Forest Collaborative (PFC) was one of the groups that filed public comments on the Tower Project. The PFC includes conservation groups (Idaho Conservation League, The Lands Council, & Friends of Scotchman Peaks Wilderness), government groups (Bonner County), timber interests (Idaho Forest Group & Mike Reynolds Logging) and recreation groups (Sandpoint Winter Riders & Panhandle Riders Association). Forest Service officials met with the PFC to address their concerns. *See Knight Declaration (Dkt. No. 14-1)* at ¶ 9. The PFC recommended against salvaging timber from any old growth stands, and encouraged the Forest Service to reduce the amount of temporary road construction. *See Brief (Dkt. No. 25)* at p. 2. The Forest Service followed these recommendations, reducing the temporary road construction from

4.6 miles to 1.2 miles, and deciding not to harvest 800 acres of old growth timber. *Id.* Because the Forest Service made these changes, the PFC supports the Tower Project. *Id.*

The Kootenai Tribe of Idaho was also monitoring the two Projects. The Tribe helped create, and actively participates in, the Kootenai Valley Resource Initiative (KVRI), a collaborative group including the City of Bonners Ferry, Boundary County, environmental groups, and representatives of business and industry. *See Brief (Dkt. No. 28-1)* at p. 6. Forest Service officials met with Tribal representatives and members of the KVRI to listen to their comments on the Projects. *See Knight Declaration (Dkt. No. 14-1)* at ¶ 9. The Tribe has previously been involved in forest restoration efforts in the IPNF, and both the Tribe and the KVRI support the Tower and Grizzly Projects largely because of the restoration work planned in both Projects. *Id.*

Other public comments were critical of logging in riparian areas. *See Knight Declaration (Dkt. No. 14-1)* at p. 6. The Forest Service responded by excluding those areas from logging. *Id.*

As mentioned, the scoping letters noted that the Forest Service was seeking an ESD on both projects. Without an ESD, logging would not begin immediately upon the Forest Service's final approval of the Projects because the agency must await a 90-day period to allow the public to make any objections to the final decision. Because of the short season for logging due to harsh winters, a delay to allow the 90-day objection period to run could push the logging into the summer of 2017. *See ESD Decision Memorandum (Dkt. No. 8-15)* at pp. 1-3. During this delay, the burned trees would

deteriorate, making them less valuable, and reducing the revenue needed for the reforestation efforts. *Id.* This lost revenue was estimated to be $2.7 million for the Tower Project and $927,911 for the Grizzly Project. *See ESD Request – Tower Project (Dkt. No. 8-16) at p. 21; ESD Request – Grizzly Project (Dkt. No. 14-7) at p. 18.* These would be significant losses: About 50% of the revenue from the timber sales was to be used to fund the reforestation efforts. *Id.* Delay would also mean that hazards like tree falls would continue, threatening the public and workers engaged in reforestation. *Id.* at p. 1.

Taking all of this into account, the Chief of the Forest Service issued an ESD for the Grizzly Project on May 13, 2016, *see ESD (Dkt. No. 8-14),* and an ESD for the Tower Project on June 2, 1016. *See ESD (Dkt. No. 8-15).* The Forest Service then issued Decision Notices, Findings of No Significant Impact, and Environmental Assessments for the Tower and Grizzly Projects on June 23, 2016, and June 30, 2016, respectively. *See EA (Tower Project) (Dkt. No. 8-10); EA (Grizzly Project) (Dkt. No. 8-4).*

Alliance brought this action to halt the logging. It argues the Forest Service violated NEPA, the Appeals Reform Act, and the APA by (1) failing to allow a public comment period for the Projects' EAs; (2) unlawfully issuing ESDs for the Projects; (3) refusing to prepare an Environmental Impact Statement (EIS); (4) failing to address the Projects' impacts on the black-backed woodpeckers; and (5) arriving at a decision even before conducting the EAs.

The Court will consider these challenges after reviewing the governing legal standards.

## LEGAL STANDARDS

**Standard Under the Administrative Procedure Act**

Plaintiff's claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*. Under the APA, an agency action must be upheld unless it is found to be arbitrary or capricious. 5 U.S.C. § 706(2)(A). To decide if an agency action is arbitrary and capricious, the court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Pacific Coast Federation of Fishermen's Ass'ns, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th Cir.2001). The agency's decision need not be a model of clarity so long as "the agency's path may reasonably be discerned." *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007). Judicial review under this standard is to be "searching and careful," but remains "narrow," and a court should not substitute its judgment for that of the agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993).

**Standard for Temporary Restraining Order or Preliminary Injunction**

The analysis required for a temporary restraining order and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). The party seeking an injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of

preliminary relief; (3) that the balance of equities/hardship tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def Council*, 555 U.S. 7, 20-23 (2008). "[S]erious questions on the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). This "sliding scale approach" allows a party to make a lesser showing of likelihood of success provided he will suffer substantial harm in the absence of relief. *Id*. at 1133. Under this approach, however, "serious questions going to the merits" requires more than showing that "success is more likely than not;" it requires a plaintiff to demonstrate a "substantial case for relief on the merits." *See Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).

## ANALYSIS

### Likelihood of Success on the Merits -- ESDs

The Court turns first to Alliance's challenge to the ESDs. When an emergency justifies expedited action, an agency may issue an ESD and begin work on a project immediately upon its approval without waiting for the standard 90-day objection period. To issue an ESD, the Forest Chief must find that the immediate implementation of the project was necessary for "for relief from hazards threatening human health and safety" or to avoid "a loss of commodity value sufficient to jeopardize the agency's ability to

accomplish project objectives directly related to resource protection or restoration." *See* 36 C.F.R. §§ 218.21(b).

Here, the Forest Chief found that both grounds applied: (1) The burned trees constituted a hazard to the public and to reforestation efforts, and (2) delay would allow the trees to deteriorate, causing a loss in value of over $3 million and jeopardizing the reforestation plans contained in both Projects. *See ESD (Dkt. No. 8-14); ESD (Dkt. No. 8-15).* Alliance challenges both findings.

With regard to the hazard finding for the Tower Project, the Forest Service estimated that within the 2,373 acres that occur along the roads that are proposed for danger tree removal, there are about a million dead trees. *See Relevant Background Information for ESD (Dkt. No. 8-16)* at p. 17. The agency concluded that these trees "can fall at any time" and posed a significant risk to the public and those working on reforestation projects. *Id.*

Alliance responds that removal of dead trees would occur even without the Projects because the no-action alternative in the EAs provided for removal of the dangerous trees. But this argument does not refute the Forest Service's finding that the burned trees pose a hazard – if anything, it merely confirms the hazard, because they must be removed no matter whether the Projects are approved or not.

Alliance also argues that the public could be protected from the hazards by closing temporarily the dangerous areas. The Forest Service rejected this option because the large number of dead trees along roadsides would mean that "[p]ublic access for

recreational opportunities would be greatly reduced . . . ." *Id.* Alliance's argument essentially invites the Court to micromanage the Forest Service, an invitation the Ninth Circuit rejected in *Klamath Siskiyou Wildlands Center v. Grantham,* 2011 WL 1097749 (9th Cir. 2011). There, an environmental group challenged an ESD and proposed an "alternative method for minimizing safety hazards." *Id.* at *2. The Circuit rejected the argument, holding that "[u]nder the [APA], a court is not permitted to simply substitute its judgment for that of the agency." *Id.*

The Court turns next to Alliance's challenges to the second prong of the Forest Service's rationale for the ESD – the need to act quickly to preserve the economic value of the burnt timber to fund reforestation efforts. The Forest Service analyzed in detail the deterioration that would occur if the logging was delayed. The burned trees are attacked by insects and fungi, and develop cracks that make them unmarketable. *See Grizzly Project Relevant Background Information, supra,* at p. 16. In the Tower Project area, 86% of the volume of timber proposed for removal is from tree species having thin bark, a species that "dries faster and more extensively in the first year than thick-barked species, resulting in more checking, cracking and breakage." *See Tower Project Relevant Background Information, supra,* at p. 18. The Grizzly Project has similar figures. The record leaves little doubt that significant deterioration will occur if the Projects are delayed until June of 2017.

Alliance's challenge does not focus as much on the fact of deterioration as on its economic effect. Alliance argues that the Forest Service's own estimate is that revenue

will only drop 33%, leaving more than enough funds from the timber sales to complete reforestation. It is true that the Forest Service at one point states that the "value of the timber" will decrease by about 33% due to delay. *See Grizzly Project Relevant Background Information, supra,* at p. 18. But when the Forest Service examined *revenue* loss in a detailed manner, the agency concluded that revenue would drop by 47% in the Grizzly project if the delay stretched into June of 2017, and the diminished revenue would not be enough to fund the reforestation efforts. *See Table 6 (Dkt. No. 14-7).* For the Tower Project, the Forest Service estimates a 55% revenue loss, and the diminished revenue would not be enough to fund the reforestation efforts. *See Table 7 (Dkt. No. 8-16).*

Even these loss figures could be overly optimistic because they assume someone will file a bid to salvage the burned timber, an assumption that – at the time the ESDs were issued – was shaky at best. Based on a survey of the market, the Forest Service concluded there was a real risk that no bids might be received:

> Given current market trends, the additional deterioration would greatly increase the risk that the timber *would not sell*, assuming that the timber is still economically and operationally viable for timber sale purchasers. If the sales do not sell . . . the agency's ability to accomplish project objectives directly related to resource restoration would be jeopardized.

*See Grizzly Project Relevant Background Information, supra,* at p. 17 (emphasis added). If the timber did not sell, the Forest Service concluded, all of its reforestation efforts would "need to be funded entirely through Congressional appropriations," a highly

unlikely scenario. *Id.* at p. 18. The same conclusion was reached for the Tower Project. *See Tower Project Relevant Background Information, supra,* at p. 20-23.

Given this, the Court cannot find that Alliance has raised serious questions on the merits of the issue whether the Forest Service acted arbitrarily in issuing the ESDs.

**Likelihood of Success on the Merits – Public Involvement**

Alliance argues that it has raised serious questions that the Forest Service violated NEPA by failing to give the public an opportunity to comment on the EAs before issuing its FONSIs. There is no requirement in every case that a draft EA be submitted for public comment before the final EA and FONSI are issued. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir.2008). But the agency "must offer significant pre-decisional opportunities for informed public involvement in the environmental review process by releasing sufficient environmental information about the various topics that the agency must address in the EA, such as cumulative impacts, before the EA is finalized." *Id.* at 1026 (quoting *Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984 (E.D. Cal. 2005)).

Thus, the Forest Service has been found to have violated NEPA when it failed to advise the public that part of its logging of burnt timber would occur in an area being considered for wilderness designation. *See Center for Biological Diversity v. Gould,* 150 S.Supp.3d 1170 (E.D.Ca. Dec. 14, 2015). Similarly, the Forest Service was determined to have violated NEPA when it failed to advise the public of the impacts its logging

project would have on wildlife and other environmental resources. *Weingardt,* 376 F.Supp. 2d at 986-87, 992.

But no NEPA violation was found when information about a mining project was "widely disseminated throughout the community," and "a high level of public comment . . .most of it favoring the project." *Bering Strait,* 524 F.3d at 953. The agency made other efforts such as running a weekly newspaper column for 18 weeks, giving radio interviews, and making joint efforts with state agencies to explain the projects. *Id.* In a similar case, the Forest Service did not violate NEPA when it provided scoping letters to 435 interested parties along with a notice to the general public, solicited and responded to public comments, and held two public meetings to explain the project. *Sierra Nevada Forest Protection Campaign v. Rey,* 573 F.Supp.2d 1316, 1351 (E.D. Ca. Aug. 1, 2008), reversed in part on other grounds, and affirmed in part, *Sierra Forest Legacy v. Sherman,* 646 F.3d 1161 (9th Cir. 2011).

This case is much closer to *Bering Strait* and *Rey* than to *Gould* and *Weingardt.* Here, the Forest Service sent scoping letters to a total of over 500 interested parties. Those two letters, about 20 pages each, described in detail the scope of the logging, and included maps of the Projects. In addition to alerting the public that the Forest Service intended to obtain an ESD for each Project, the letters explained the potential impacts to (1) forest vegetation; (2) economic effects on local communities; (3) fuels that could sustain wildfires; (4) soils; (5) hydrologic resources and fish habitat; (6) wildlife and wildlife habitat; (7) rare plants; (8) trails and recreation use; (9) visual resources; and (10)

cultural resources. Each letter solicited public comments. As discussed above, Forest Service officials met with a wide variety of local governmental officials, environmental groups, tribal leaders, and others to explain the Projects and listen to objections. The Forest Service was responsive to the objections, changing the Projects in some aspects to accommodate various concerns. This public outreach prompted collaborative groups like KVRI and PFC – representing a wide range of governmental, environmental, Tribal, business, and industry interests – to support the Projects.

Alliance argues that the Forest Service should have described much more about the Projects, and that its 20-page scoping letters are quite slight when compared to the EAs that run hundreds of pages. For example, Alliance points out that while the EAs addressed important issues like how loggers will determine if a tree is "dying" or how the habitat of the black-backed woodpecker was modeled, the scoping letters were silent on these issues, giving the public no information on which to comment. Although Alliance says that it is not arguing that a draft EA should have been submitted, that is essentially what it is arguing here. Alliance raises detailed issues of the type typically addressed in the hundreds of pages of the EA, and if every scoping letter must address issues of that detail, an EA would have to be submitted for public comment in every case, a position expressly rejected by *Bering Strait.*

Moreover, Alliance filed comments during the public comment period and those comments cover the same issues it now raises, showing that it had enough information to flag these issues for the Forest Service. *See ForestKeeper v. Elliott,* 50 F.Supp.3d 1371,

1388 (E.D.Ca. Sept. 25, 2014) (rejecting argument that public outreach on logging project was insufficient in part because "the specificity and scope of information Plaintiffs did provide in their comments shows that they were adequately informed of the issues").

Under these circumstances, the Court finds that Alliance has not raised serious questions that the Forest Service violated NEPA by failing to give adequate public notice and an opportunity for comment.

**Likelihood of Success on the Merits – Failure to Prepare an EIS**

Alliance claims that it has raised serious questions on the issue whether the Forest Service violated NEPA by failing to prepare an EIS. It is unreasonable for the Forest Service to fail to prepare an EIS if "substantial questions exist" whether a proposed action "may have a significant effect on the environment." *N.R.D.C. v. Winter*, 502 F.3d 859, 867 (9th Cir.2007). The Forest Service must provide convincing reasons as to why the proposed timber sale will not have a significant impact on the environment. *Ctr. for Biological Diversity v. Nat. Highway Traffic Safety Comm'n*, 538 F.3d 1172, 1220 (9th Cir.2008). "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Native Ecosystems Council v. Tidwell,* 599 F.3d 926, 937 (9th Cir.2010).

Whether a project's effects are significant "requires consideration of context and intensity." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008); see also 40 C.F.R. § 1508.27. Context refers to the scope of

the agency action. *Id.* Intensity refers to the "severity of impact, which includes both beneficial and adverse impacts, the degree to which the proposed action affects public health or safety, the degree to which the effects on the quality of the human environment are likely to be highly controversial, the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, and whether the action [involves] cumulatively significant impacts." *Id.* at 1185-1186.

In reviewing the decision not to prepare an EIS under the arbitrary and capricious standard, this Court must ask whether the agency has taken a "hard look" at the consequences of its proposed action, based its decision on consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant. *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005).

In examining the context element, it is important that the logging will take place in a relatively small area. The Tower Project will only log about 13% of the acres burned, while the Grizzly Project will only log about 12% of the acres burned. The logged areas represent just 0.2% of the IPNF.

With regard to intensity, the Forest Service examined the same scientific articles submitted by Alliance but came to a different conclusion, primarily because these Projects are so small and their potential impacts are reduced through adoption of mitigation measures. *See EA-Grizzly Project (Dkt. No. 8-4)* at p. 14; *EA-Tower Project (Dkt. No. 8-10)* at p. 26. "[A]n agency is entitled to wide discretion in assessing the

scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003). The EAs contain lengthy discussions of the environmental impacts of the logging Projects and indicate that the Forest Service took the required "hard look" at both Projects. The Court cannot find that Alliance has raised serious questions that the Forest Service failed to take the required "hard look" at the context and intensity of these two Projects and thereby violated NEPA.

## Conclusion

In the West, fuel and climate are combining to create intense wildfires. Fuels are increasing at an alarming rate as invasive plant species spread across the landscape, while at the same time climate change is lengthening the fire season. This means burnt timber is becoming a major feature of our National Forests. If trees can be logged simply because they burned, we will reap massive clear-cuts. But small projects, fully vetted and properly designed to mitigate impacts, may be valuable in reducing hazards and funding reforestation efforts. The Tower and Grizzly Projects fit that mold. Under the particular facts of this case, the Court cannot find that Alliance has raised the serious questions necessary to obtain injunctive relief. For that reason, the Court will deny Alliance's motion.[1]

---

[1] There are three pending motions to file amicus briefs. Alliance raises a strong objection that the motions were filed too late for Alliance to offer a full response given the briefing schedule. Accordingly, the Court has not reviewed these briefs for their legal arguments. Rather, the Court reviewed them only for background information on the pre-decision participation of these groups, the PFC, the KVRI, and the Tribe. Portions of that information were also contained in the briefing materials and is not disputed. The Court will grant the motions for that limited purpose.

# ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that plaintiff's Motion for Preliminary Injunction and/or Temporary Restraining Order (docket no. 7) is DENIED.

IT IS FURTHER ORDERED, that the motions for amicus briefs (docket nos. 15, 16, & 28) are GRANTED for the limited purpose described in the Memorandum Decision.

IT IS FURTHER ORDERED, that Alliance's motion to strike the amicus brief (docket no. 21) is DENIED.

DATED: May 1, 2017

B. Lynn Winmill
Chief Judge
United States District Court